23-14218-H

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**Glenn Howell,**

*Plaintiff /Appellee,*

**v.**

**Clayton County Sheriff Victor Hill,**

*Defendant /Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
Civil Action File No. 1:20-CV-02662-WMR

---

## BRIEF OF DEFENDANT-APPELLANT
## CLAYTON COUNTY SHERIFF VICTOR HILL

---

Sean Keenan
Ashley Landers
**CRUSER, MITCHELL, NOVITZ,**
**SANCHEZ, GASTON & ZIMET, LLP**
Meridian II, Suite 2000
275 Scientific Drive
Norcross, Georgia 30092
(404) 881-2622
skeenan@cmlawfirm.com
alanders@cmlawfirm.com
*Attorneys for Defendant /Appellant*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT OF
APPELLANT-DEFENDANT VICTOR HILL**

In accordance with 11th Circuit Rule 26.1-1(a)(3), Appellant Victor Hill hereby files this Certificate of Interested Persons and Corporate Disclosure Statement. The undersigned counsel of record for Appellant Hill in the above styled action certifies that the following is a full and complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, including any subsidiaries, conglomerates, affiliates, parent corporation and any publicly held corporation that owns 10% or more of the stock of a party, and any other identifiable legal entities related to a party:

Clayton County, GA

Clayton County Board of Commissioners

Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP

Freeman, Mathis & Gary, LLP

Hancock, Jack Reynolds

Hill, Victor

Howell, Glenn

Keenan, Sean

Landers, Ashley Marie

*Howell v. Sheriff of Clayton County Victor Hill.*
Appeal No. 23-14218-H

Law Office of Darryl L. Scott, LLC

Ray, William M., District Judge, USDC, NDGA

Scott, Darryl L.

Sabzevari, Arash A.

No publicly held corporation owns 10% or more of the stock of a party.

**CRUSER, MITCHELL, NOVITZ, SANCHEZ, GASTON & ZIMET, LLP**

By: */s/ Sean Keenan*
    Sean Keenan
    Georgia Bar No.: 523871

Cruser, Mitchell, Novitz,
Sanchez, Gaston & Zimet, LLP
Meridian II, Suite 2000
275 Scientific Drive
Norcross, Georgia 30092
(404) 881-2623

## STATEMENT REGARDING ORAL ARGUMENT

Appellant-Defendant requests oral argument pursuant to 11th Cir. R. 28-1(c). Oral argument is warranted because the Eleventh Circuit has the opportunity to clarify how and when the use of passive restraint via a safety restraint chair becomes excessive force and deprives law enforcement officers of qualified immunity.

<u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS…………………………….. C1 of 2

STATEMENT REGARDING ORAL ARGUMENT…………………………… i

TABLE OF CONTENTS……………………………………………………ii

TABLE OF AUTHORITIES……………………………………………iv

STATEMENT OF JURISDICTION……………………………………viii

STATEMENT OF THE ISSUES………………………………………1

STATEMENT OF THE CASE…………………………………………2

    I.    Course of Proceedings and Disposition Below……………………..2

    II.    Factual Background…………………………..……………………..3

        I.  Howell's Company Hired to Work on Deputy Guthrie's Property..3

        II.  Howell Became Threatening and Aggressive……………………..4

        III. Deputy Guthrie's Communication with Sheriff Victor Hill………6

        IV. Howell's Harassing Communications to Hill……………………7

        V.  Warrant for Howell's Arrest……………………………………9

        VI. Clayton County Jail Intake……………………………………11

        VII.  Howell's Placement in Restraint Chair………..……………11

        VIII.  Medical Infirmary & Release………………………………13

    III.    Standard and Scope of Review   ………………………………..14

SUMMARY OF THE ARGUMENT……………………………………..…..15

ARGUMENT AND CITATIONS OF AUTHORITY…………………………16

I.    The District Court Erred by Denying Hill Qualified Immunity………16

    A. Hill's Use of the Restraint Chair Was Not Objectively Unreasonable and Did Not Constitute Excessive Force………………………………17

    B. Use of The Restraint Chair Did Not Violate Clearly Established Law under Any of the Three "Fair Warning" Methods…………………23

        1. There is No Applicable Case Law with Indistinguishable Factors………………………………………………24

        2. There Is No Broad Statement of Principle Within the Constitution, State, or Case Law that Applies with Obvious Clarity to These Facts…………………..29

II.    The District Court Abused its Discretion in Denying Hill Summary Judgment When it Failed to Follow LR 56.1…………………………32

CONCLUSION……………………………………………………………34

CERTIFICATE OF COMPLIANCE………………………………………36

CERTIFICATE OF SERVICE……………………………………………37

# TABLE OF AUTHORITIES

Cases                                                                Page(s)

Ashcroft v. al-Kidd,
  563 U.S. 731 (2011).................................................................22

Battle v. Bd. of Regents for Georgia,
  468 F.3d 755 (11th Cir. 2006) .................................................18

Bell v. Wolfish,
  441 U.S. 520 (1979)...........................................................23, 37

Bingham v. HCA, Inc.,
  783 F. App'x 868 (11th Cir. 2019) .........................................24

Block v. Rutherford,
  468 U.S. 576 (1984)................................................................23

Brown v. City of Huntsville, Ala.,
  608 F.3d 724 (11th Cir. 2010) .................................................21

Cagle v. Sutherland,
  334 F.3d 980 (11th Cir. 2003) .................................................21

City of Tahlequah, Oklahoma v. Bond,
  595 U.S. 9 (2021)....................................................................30

Cockrell v. Sparks,
  510 F.3d 1307 (11th Cir. 2007)...............................................23

Coffman v. Battle,
  786 F. App'x 926 (11th Cir. 2019) .........................................32

Coffman v. Battle,
  2019 WL 10303633 (N.D. Ga. Jan. 22, 2019) .......................32

Cordoba v. Dillard's, Inc.,
  419 F.3d 1169 (11th Cir. 2005)...............................................24

Crocker v. Beatty,

995 F.3d 1232 (11th Cir. 2021)............................................................Passim

Danley v. Allen,
    540 F.3d 947 (11th Cir. 2019)....................................................25

District of Columbia v. Wesby,
    138 S.Ct. 577 (2018)............................................................21, 22

Ellis v. England,
    432 F.3d 1321 (11th Cir. 2005)....................................................23

Fils v. City of Aventura,
    647 F.3d 1272 (11th Cir. 2011)....................................................19

Gardner v. Mack,
    2015 WL 877249 (S.D. Ala. Mar. 2, 2015).....................................21

Gonzalez v. Reno,
    325 F.3d 1228 (11th Cir. 2003)....................................................19

Hedberg v. Ind. Bell Tel. Co.,
    47 F.3d 928 (7th Cir. 1995)........................................................24

Hope v. Pelzer,
    536 U.S. 730 (2002)................................................................37

Jacoby v. Beers,
    779 F. App'x 676 (11th Cir. 2019) ............................................24, 32

Kelly v. Curtis,
    21 F.3d 1544 (11th Cir. 1994)....................................................22

Kingsley v. Hendrickson,
    576 U.S. 389 (2015)............................................................Passim

Maldonado v. Unnamed Defendant,
    648 F. App'x 939 (11th Cir. 2016) ..............................................32

Mann v. Taser Int'l, Inc.,
    588 F.3d 1291 (11th Cir. 2009)....................................................40

McClish v. Nugent,
    483 F.3d 1231 (11th Cir. 2007)....................................................30

McNeeley v. Wilson,
    649 F. App'x 717 (11th Cir. 2016) ...........................................................32

Mize v. Jefferson City Bd. of Educ.,
    93 F.3d 739 (11th Cir. 1996) ................................................................24

Murphy v. Cobb County Adult Detention Center,
    2007 WL 1020798 (N.D. Ga. Mar. 30, 2007)....................................32

Myrick v. Fulton Cnty.,
    69 F.4th 1277 (11th Cir. 2023)..............................................................34

O'Neal v. DeKalb Cnty.,
    850 F.2d 653 (11th Cir. 1988) ...............................................................40

Ort v. White,
    813 F.2d 318 (11th Cir. 1987) ...............................................................25

Perdue v. Union City,
    2006 WL 2523094 (N.D. Ga. Aug. 28, 2006)........................................33

Piazza v. Jefferson City,
923 F.3d 947 (11th Cir. 2019)................................................... 20,25, 35

Plumhoff v. Rickard,
    572 U.S. 765 (2014)........................................................................30, 35

Priester v. City of Riviera Beach,
    208 F.3d 919 (11th Cir. 2000) ...............................................................22

Reese v. Herbert,
    527 F.3d 1253 (11th Cir. 2008) .............................................................39

Reynolds v. Wood Co.,
    2023 WL 3175467 (5th Cir. May 1, 2023)............................................37

Rivas-Villegas v. Cortesluna,
    595 U.S. 1 (2021)..............................................................................35, 38

Saucier v. Katz,
    533 U.S. 194 (2001)...............................................................................21

Scott v. Harris,
  550 U.S. ...................................................................................... 19

Shuford v. Conway,
666 F. App'x 811 (11th Cir. 2016) ....................................................Passim

Taylor v. Nettles,
  2012 WL 4324444 (D.S.C. Sep. 20, 2012)................................................ 34

United States v. Lanier,
  520 U.S. 259 (1997).................................................................................. 29

White v. Pauly,
  137 S. Ct. 548 (2017) ............................................................................... 22

Williams v. Burton, 943 F.,
  943 F.2d 1572 (11th Cir. 1991)................................................ 24, 34, 36, 37

Statutes

42 U.S.C. § 1983 ................................................................................... viii,5, 6

28 U.S.C. § 1291……………………………………………………………viii

28 U.S.C. § 1331……………………………………………………………viii

Rules

11th Cir. R. 28-l ...........................................................................................i,8

11th Cir. R. 28-5 ............................................................................................. 8

FRAP 4(a)(1)(A)………………………………………………..………viii

FRAP 32(a)(5) and (6)................................................................................... 42

FRAP 32(a)(7)(B)........................................................................................... 42

FRAP 32(f) ..................................................................................................... 42

Other Authorities

NDGA LR 56.1.................................................................................. 38, 39, 40

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Under 28 U.S.C. § 1331, the District Court had federal question jurisdiction over this civil action brought under 42 U.S.C. § 1983 seeking recovery for the alleged violation of Appellee's Fourteenth Amendment rights. After discovery closed, Appellant-Defendant moved for summary judgment. (Doc. 64). On November 27, 2023, the District Court denied Appellant-Defendant's motion. (Doc. 78). On December 21, 2023, Appellant-Defendant filed a Notice of Appeal from the order entered on November 27, 2023. (Doc. 79). The appeal, which was filed within thirty days of the order denying summary judgment, was timely filed. See Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether the District Court incorrectly denied Defendant/Appellant Victor Hill, the former Clayton County Sheriff, qualified immunity as to Plaintiff/Appellee Glenn Howell's 42 U.S.C. § 1983 claims against him in his individual capacity?

2. Whether the District Court incorrectly ruled that Defendant/Appellant Hill's use of a restraint chair on a non-resisting pre-trial detainee was objectively unreasonable and excessive in violation of Fourteenth Amendment's due process clause?

3. Whether the District Court incorrectly ruled that there is clearly established law notifying Defendant/Appellant Hill that the use of a restraint chair on a non-resisting pre-trial detainee violated the Fourteenth Amendment?

4. Whether the use of a restraint chair constitutes "use of force," much less constitutionally excessive force versus de minimis force?

## STATEMENT OF THE CASE

**I.**    Course of Proceedings and Disposition Below

In this civil rights action filed pursuant to 42 U.S.C. § 1983, Appellee Glenn Howell ("Howell") alleges that while incarcerated as a pretrial detainee at the Clayton County Jail ("CCJ"), he was, at the express direction of former Clayton County Sheriff, Appellant Victor Hill ("Hill"), strapped to a restraint chair for six hours and then placed in a suicide cell for the purpose of punishment and without any legitimate non-punitive governmental objective. (Doc. 1). Howell originally filed suit against Hill in both his individual and official capacities. (Id.) Hill filed a motion to dismiss all of Appellee's claims in the complaint due to its failure to state a claim and based on various immunities. (Doc. 12-1). Howell did not respond to the motion, but instead filed an amended complaint on September 29, 2020, voluntarily dismissing Hill as a party in his official capacity and dismissing his state law claim for intentional infliction of emotional distress. (Doc. 17).

As a result, the only remaining claim after the amendment is Howell's Section 1983 claim alleging excessive force in violation of the Fourteenth Amendment against Hill in his individual capacity. (Id.) On October 13, 2020, Hill moved to dismiss Howell's amended complaint, re-asserting his entitlement to qualified immunity. (Doc. 18-1.) On February 19, 2021, after receiving briefing from the parties, the District Court entered an order denying Hill's motion to dismiss. (Doc. 29.)

On September 15, 2021, the case was stayed until the conclusion of Hill's criminal prosecution, <u>United States v. Victor Hill</u>, Case No. 1:21-CR-143 (U.S. Dist. Ct., NDGA)[1]. (Doc. 44). On March 10, 2023, following Hill's conviction, the court lifted the stay and discovery resumed. (Doc. 50).

On July 7, 2023, after discovery closed, Hill moved for summary judgment on the basis that he was entitled to qualified immunity as he did not violate Howell's constitutional rights. (Doc. 64.) On July 28, 2023, Howell responded to the motion (Doc. 65.) and Hill filed a reply brief on January 30, 2023. (Doc. 71.) The District Court heard oral arguments on October 15, 2023, before entering an order denying Hill's motion for summary judgment on November 27, 2023. (Doc. 78.) Appellant Hill timely filed a Notice of Appeal on December 21, 2023. (Doc. 79.)

**II.** Factual Background

A. <u>Howell's Company Hired to Work on Deputy Guthrie's Property</u>

In early 2020, Clayton County Sheriff's Deputy Joshua Guthrie ("Deputy Guthrie") hired Howell's company, Spectrum Landscape, to perform some grading work on his personal residence in Butts County, Georgia, for an agreed upon price of $3,500.00. (Glenn Howell Deposition Transcript, Doc. 63-1, pp. 32-34 (124:25 – 130:3)).[2] Deputy Guthrie paid a deposit before Howell began his work on April 18,

---

[1] The criminal case currently is on appeal before this Court in <u>USA v. Victor Hill</u>, Appeal No.23-10934.

[2] In compliance with 11th Cir. R. 28-1 and 11th Cir. R. 28-5, Appellant cites to the district court docket sheet document number and page number that appear in the header generated by the district court's electronic filing system. However, Document 63-1 was filed as a condensed transcript of

2020. (Id.). The men quickly got into a verbal altercation when a plumber on the property caused a delay to Howell's work, and he demanded Deputy Guthrie pay him more money while he completed other tasks. (Id.). Deputy Guthrie told Howell he would not pay him any more money until he finished the job and asked Howell to get off his property after the pair started cussing at each other. (Id.).

### B. Howell Became Threatening and Aggressive

After being asked to leave, Howell threatened to "take a Bobcat and take it through [his] front door and to the back." (Id., p. 33 (128:10 - 18). This statement prompted Deputy Guthrie to threaten calling the police, to which Howell responded in a threatening manner a second time, "bring your ass out here in the driveway [that he's] going to kick [his] ass…and put a lien on [his] house." (Id., p. 33 (128:18 - 24)). Thereafter, Deputy Guthrie followed through and called the police. (Id.). Upon arrival, the City of Jackson police officer interviewed both men and told Howell that he could go to the court and fill out some paperwork, in response to Howell's statement that "he had a client that was refusing to pay." (Id., p. 35 (135:2 – 136:23)).

Howell removed his equipment from Deputy Guthrie's property while the officer was present, but later that evening Deputy Guthrie text messaged Howell to notify him that he left behind a saw and a cord and that he could come back with a police escort to pick them up. (Id., pp. 35 (135:22 – 136:5); Exhibit 6 to Howell's

---

deposition testimony with four pages per sheet, so for clarity, Appellant also cites to the transcript page and line assigned by the court reporter.

Deposition, Doc. 63-2, p. 3). Howell replied to the text with "the next contact will be from my attorney it will at least cost you $1000 down payment for attorney there's no threatening about that you screwed over a contractor like you said I'll take you to civil court" to which Deputy Guthrie simply replied, "[o]kay." (Doc. 63-2, pp. 3-4). The following morning, Howell sent text messages to Deputy Guthrie asking "[h]ow's that rain this morning" accompanied by a laughing emoji to, by his own admission, be "a smart ass" and asking when he could come by with an officer to pick up his tools. (Doc. 63-1, p. 36 (139:10 - 14) and Doc. 63-2, p. 5). Deputy Guthrie did not engage and unaffectedly replies, "I'm awake whenever is good for you." (Doc. 63-2, p. 5). Howell returned to Deputy Guthrie's home without a police escort to pick up his tools and to take pictures of Deputy Guthrie's home "to be able to have evidence of what it looked like …[t]o be able to put a lien on his house. (Doc. 63-1, pp. 35-36 (137:18 – 139:9)).

Two days later, Howell went back, testifying that while the reason for this subsequent visit was to provide an estimate for a neighbor, he still took it upon himself to go back to Deputy Guthrie's house and take more pictures. (Id.). After Howell's return visit, Deputy Guthrie texted him stating, "[t]his is your last warning. You have no business at or near my house. I'm about to get a restraining order and or arrest warrants if needed." (Doc. 63-2, p. 6). Howell replied to Deputy Guthrie with the following text: "[w]hat are u talking about Go fuck yourself pony boy!!! When's the last time u had a drug test on those steroids I'll be making a phone call to your boss

about how u do contractors And will be suing u for the labor I did that day Good luck

Just letting u know now I have a contact with the homeowner across the street!!!!!!! So

fuck off bitch ass." (Id.).

    C.  <u>Deputy Guthrie's Communication with Sheriff Victor Hill</u>

      Following the aggressive text messages from Howell, Deputy Guthrie contacted

Hill to notify him that he had contacted the Jackson Police Department during the

altercation.  (Excerpt of Victor Hill's Testimony in Criminal Jury Trial, Doc. 64-4, pp.

4:23 – 5:24). Based on his conversation with his deputy, Hill understood that two

police reports had been made on Howell, the first, for running Deputy Guthrie's

girlfriend off the road and the second, for destroying Deputy Guthrie's yard. (Id., p.

6:10 - 17). Hill also knew that Howell kept driving back and forth in front of Deputy

Guthrie's home and other bizarre behavior. (Id.) Hill was heard that Howell was

making pig-type statements about law enforcement, such as "I smell bacon, I should

have known you was a pig." (Id., p. 7:6 – 20). This concerned Hill, especially for

Deputy Guthrie and his family's safety, considering Howell had destroyed his front

yard, ran his girlfriend off the road, and continued to drive back and forth by his

house. (Id., pp. 7:21 – 8:2). Based on all of this, Hill understood Howell to be a threat

to Deputy Guthrie and thought if he called him, he could possibly calm the situation

down. (Id., p. 8:3 – 11).

### D. Howell's Harassing Communications to Hill

About twenty minutes after speaking to Deputy Guthrie over the phone, Howell received a phone call from an anonymous number, he answered and the caller identified himself as "the sheriff of Clayton County, Victor Hill." (Doc. 63-l, p. 36 (140:24 – 142:23)). According to Howell's testimony, Howell asked if he was serious and Hill responded by stating "I'm very serious …I need you to quit harassing my deputy." (Id., p. 37 (142:24 – 143:2)). Howell recalls responding by advising Hill to tell his deputy to pay his debt, because it didn't make either of them look good and then laughing. (Id., p. 37 (143:3 - 7)). Hill asked if Howell wanted his office to investigate the issue, or in the alternative, come down and speak to him about his concerns directly. (Doc. 64-4, p. 9:1-13). Howell confirmed for the second time that he was in fact speaking with the sheriff, Victor Hill and announced, "[i]f this is really Victor Hill, I just seen three leprechauns jump onto the rainbow." (Doc. 63-l, p. 37 (142:25 – 143:11)).

According to Howell's testimony, Hill called him "a smart ass" and told him he better watch his mouth and Howell replied "[w]ell, you better go fuck yourself" and testified to using the F word multiple times during their initial call. (Id., p. 37 (143:12 – 146:25)). Howell testified that Hill told him, "if you keep running your mouth like that, I'm going to come get you" and his response was, "[w]ell, you can't do a fucking thing because you're not my fucking sheriff." (Id., p. 37 (143:16-19)). Howell asked Hill for the third time if this was "the sheriff, Victor Hill, of Clayton County," after

Hill confirmed again that it was in fact him, Howell responded, "[w]ell, go fuck yourself, pony boy" and hanging up. (Id., pp. 37-38 (143:21-25, 147:20-23)).

After the call ended with Hill by "telling him to go fuck himself," he went inside, told his uncle and dad about the call and then googled who Victor Hill was and what he looked like. (Id., p. 38 (147:24 – 148:21)). Despite asking Hill to confirm his identity three separate times during their phone call, and Hill having done so, Howell was not convinced so he "FaceTimed him" but he didn't get through. (Id., p. 38 (148:21-24)). Hill did not answer initially because he did not think any further communication would be beneficial. (Doc. 64-4, p. 10:17 - 25). Howell "FaceTimed him again [but] it didn't go through. Two missed calls." (Doc. 63-1, p. 38 (148:21-24)). Howell FaceTimed Hill again and the "[t]hird time, he picked up" and "a black gentleman with a mask on [answered], nothing that identified him as Clayton County." (Id., p. 38 (148:24 -149:5)). Howell claimed "at that point, [he] thought it was a black man that Deputy Guthrie had told, hey, put some heat on him to try to get him off my back" and that "someone was impersonating the sheriff," despite testifying that he was aware that Deputy Guthrie was a sheriff's deputy with the Clayton County Sheriff's Office. (Id., p. 38 (149:6 - 16)). Howell demanded to know if this was really Victor Hill and again, Hill responded that it was. (Id., p. 39 (150:7-22)).

Howell pressed on and challenged, "well, if you're Victor Hill, go ahead and take your mask off." (Id., p. 39 (150:23 -24)). After Hill complied and removed his

mask, Howell declared, "[w]ell, now you work for me." (Id., p. 39 (150:25 – 151:1)). Howell cannot recall the remainder of his conversation with Hill with certainty, but he was able to remember "telling him that he looked like a skinny black Dave Chappelle." (Id., p. 39 (150:25 – 151:4-21)). Howell is confident that he used more profanity on the FaceTime because "[i]t comes out so flowing," it "could have [been] fuck you motherfucker, you fucking bitch, fucking pony boy." (Id., p. 39 (151:25 – 152:10)). In addition to admitting to calling Hill a pony boy at least twice, Howell revealed that the term, pony boy means "bitch boy." (Id., p. 39 (152:11 – 153:21)).

Hill texted Howell to formally warn him in writing not to call or face time him again or he will have him "arrested for harassing communications …[and] served with a TPO for harassing" Deputy Guthrie. (Id., p. 40 (154:11 – 18); Exhibit 6 to Howell's Deposition, Doc. 63-3). Despite receiving the warning message not to contact Hill again, as well as receiving confirmation from Hill himself at least four separate times, Howell chose to respond anyway and asked again, "[s]o this is Victor Hill correct." (Doc. 63-3). Hill replied, emphasizing that this was Howell's "second warning in writing to stop and not to call …or face time [Hill] again." (Id.). But Howell kept calling Hill. (Doc. 64-4, p. 11:14-16).

### E. Warrant for Howell's Arrest

Hill was concerned for his deputy because it didn't appear Howell was going to stop. (Id., p. 11:16-19). And based how he was acting with Hill, even knowing that Hill was the Sheriff, Hill felt he needed to get Howell off the street as soon as possible,

so a warrant was issued. (Id., p. 11:22 – 12:1). Howell received a phone call from the Butts County Sheriff at about 10 o'clock the following Friday morning informing him that there was a warrant out for his arrest for harassing phone calls. (Doc. 63-1, p. 41 (159:25 – 161:7)). That Friday afternoon, Hill reached out to Howell over text message to once again, identify himself as the sheriff, to inform him that there was a warrant out for his arrest and to offer him the opportunity to turn himself in. (Doc. 63-3). Hill also reached out on Saturday advising Howell to turn himself in. (Id.).

Howell did not turn himself in on Friday, Saturday, or Sunday, nor did he see the Clayton County SWAT team at his residence any of those days, nor did he have any personal interactions with Clayton County sheriff's deputies until Monday. (Doc. 63-1, p. 42 (162:22 – 165:20)). Rather, Howell retained a criminal attorney that Friday afternoon to represent him. (Id., p. 42 (164:13-20)). Hill's immediate concern was to get Howell off the streets as soon as possible because, based on how he acted with [Hill, they] had no reason to believe that he was going to stop putting that deputy at a particular threat level. (Doc. 64-4, p. 12:7-12).

Howell testified that he did not turn himself in on Monday morning because he was busy "preparing [him]self to be able to go" to jail. (Doc. 63-1, p. 43 (166:1 – 167:2)). Howell drank four beers, the last one at 4:30 pm, "to calm [his] nerves [and] just kind of get relaxed" before getting a ride from his buddy. (Id., p. 43 (168:6-24)).

F.  Clayton County Jail Intake

Howell waited until 6:30 pm on Monday to turn himself in to the Clayton County Jail. (Id., p. 42 (165:22 – 166:4)). Upon arrival, he was taken through the intake process upon his arrival at the jail and after checking in at the processing window, he was taken to a room where he was greeted by the correction officer leading his search, and escorted through a metal detector and then his body was searched. (Id., p. 45 (174:5 – 175:19)). Howell was then taken to a holding cell where he remained until he was told by an unnamed deputy to come out of the cell. (Id., p. 45 (176:1-9)). The jail footage shows Howell, in a white t-shirt, a black mask and no handcuffs being greeted by Hill who was standing outside of his cell in a royal blue shirt. (Id., p. 45 (176:10 – 177:2)). Howell remembers attempting to shake Hill's hand and Hill declining and saying something to the effect of you're way past that. (Id., p. 45 (177:3-15)). Hill had a conversation with Howell to let him know that "he could file a civil lawsuit and that he had other options to do that but driving past [Guthrie's] house, calling [Hill], running people off the road, that that was unacceptable and not to behave himself like that anymore." (Doc. 64-4, p. 13:11-17). Though the video lacks audio, Howell testified that Howell did not react well to his statements and immediately started yelling and getting loud at Hill. (Id., pp. 13:18 – 14:6).

G.  Howell's Placement in Restraint Chair

After first purchasing restraint chairs in 2018, the Clayton County Sheriff's Office ("CCSO") adopted a policy that governed when and how the chairs could be

11

used. (Doc. 65-6, p. 2). The policy states that the chair may be used: (1) "[w]hen an inmate demonstrated violent or uncontrollable behavior," *or* (2) "[t]o *prevent* inmate self -injury, injury to others or property damage." (Ex. A, p. 2 (emphasis added)).

Hill "already knew that [Howell] was a threat to law enforcement …[and] that he was someone that needed to be restrained for safety based on the things that he said, the destructive behavior, destroying the deputy's yard, running his girlfriend off the road, the things he said about law enforcement to Deputy Guthrie, in addition to things he said to [Hill], knowing that [he] was the sheriff." (Doc. 64-4, p. 14:11 - 23). Howell "was sending derogatory threats …[and u]sually people who make threats to law enforcement, they are a threat to jail security and a threat to a whole lot of other stuff as well, too." (Id., pp. 16:18 – 17:5). Further, Hill testified that he called Howell "to be friendly and offer him a chance to make a report or let [them] do an investigation," but "he became volatile toward" Hill. (Id.). After experiencing first hand both aggressive and destructive behavior from Howell, Hill knew that he presented a severe threat to jail security, and actually believed he should have been restrained earlier. (Id., p. 14:11-23).

Eventually, Hill directed Howell to be placed into the restraint chair. (Id.). Hill was present as Howell was placed into a restraint chair by an officer without the use of force. (Id., p. 15:1-5; Doc. 63-1, p. 47 (182:10 – 183:3)). The officer placed Howell's arms in the shoulder straps with his hands and wrists handcuffed behind him and his feet handcuffed together and he believes, with straps around his waist. (Id., pp. 47-48

12

(185:10 – 186:7)). Hill "assume[d] that they would remove the handcuffs for the safety restraint chair when he was placed in, per the policy." (Doc. 64-4, p. 15:2-12). Per the policy, a nurse was present to medically check the restraints and ensure that they were not too tight. (Doc. 63-1, p. 47 (184:2-19)). Prior to leaving the intake area with Deputy Guthrie, Hill ordered for Howell to also be given a mental health evaluation. (Doc. 64-4, p. 15:16-23).

### H. Medical Infirmary & Release

While restrained in the chair, Howell claims he was taken from intake to "suicide watch" located inside of the medical infirmary. (Doc. 63-1, p. 48 (188:6-14)). Though Howell testified that he was taken to "the suicide watch room," this testimony was mischaracterized and inaccurate as Howell uses the term "suicide watch room" interchangeably with "medical infirmary," where per policy, the CCJ's nurses who perform the 15-minute checks on detainees restrained in the restraint chairs. (Doc. 63-1, pp. 48-52 (188:6-202:19)). Additionally, no one at the CCJ, including Hill, claimed Howell was suicidal.

Howell remained in the restraint chair for a total of four hours until a correctional officer removed him at 0200 on April 28 and taken back to intake to complete processing. (Id., p. 50 (195:3-5)). Howell remained in the cell until it was time to leave for his court appearance, where he was granted bond and subsequently released at 9:30 p.m., 27 hours after he turned himself in. (Id., pp. 52-54 (205:14 – 207:16, 210:5-17)).

### III.    Standard and Scope of Review

Appellate courts review an order denying a motion for summary judgment de novo with the court applying the same standard of review as the district court. Battle v. Bd. of Regents for Georgia, 468 F.3d 755, 759 (11th Cir. 2006). All reasonable factual disputes are reviewed in favor of the non-moving party, but only if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. at 380.

A district court's decision to deny the defense of qualified immunity is a question of law reviewed de novo on appeal. Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003)(cert. den. 530 U.S. 1270 (2000)).

The proper standard of review with regard to Appellant Hill's argument that the District Court erred by not deeming Hill's statement of undisputed facts admitted is abuse of discretion. See Fils v. City of Aventura, 647 F.3d 1272, 1282 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

This case arises from Victor Hill's decisions about how best to maintain order and security in the jail he knew better than anyone. The District Court's denial of qualified immunity strips Hill of the constitutional protections he is afforded as a government official performing discretionary functions. The placement of pretrial detainees in safety restraint chairs, without the use of other violence or other force, is simply not excessive in violation of Due Process. The Eleventh Circuit has yet to establish that a restraint chair even constitutes the use-of-force, much less constitutionally excessive force. Indeed, placing an inmate in a restraint chair is one of the lowest levels of force that exist, and history shows that it does its job in keeping both officers and inmates safe. In the absence of a clearly established law, Hill could not possibly have been on notice that the use of a restraint chair, as alleged here, was objectively unreasonable or unconstitutional. Thus, the District Court erred in finding that Plaintiff demonstrated a triable claim on a violation of clearly established law.

ARGUMENT

I.    The District Court Erred by Denying Hill Qualified Immunity.

Government officials performing discretionary functions are entitled to qualified immunity from Section 1983 liability as long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. Cagle v. Sutherland, 334 F.3d 980, 988 (11th Cir. 2003). The very purpose of qualified immunity is "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 (11th Cir. 2010).

Here, there is no dispute that the challenged acts are discretionary. In its order denying Hill's motion for summary judgment, the District Court agreed "it is undisputed in this case that Sheriff Hill was acting within the scope of his discretionary authority as a law enforcement officer when he ordered Plaintiff strapped into a restraint chair." (Doc. 78, pg. 6.) Thus, to overcome qualified immunity at summary judgment, Howell had to satisfy a two-prong test and prove that: (1) Hill violated a constitutional right; *and* (2) this right was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018)(quoting

Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. The Eleventh Circuit has held "many times" that "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000). A "plaintiff cannot rely on general, conclusory allegations or broad legal truisms to show that a right is clearly established." Kelly v. Curtis, 21 F.3d 1544, 1550 (11th Cir. 1994); White v. Pauly, 137 S. Ct. 548, 552 (2017) (reiterating the longstanding principle that clearly established law should not be defined at a high level of generality and must be particularized to the facts of the case).

Howell did not meet this burden and the District Court incorrectly held that "Plaintiff demonstrated a triable claim on a violation of clearly established law sufficient to defeat qualified immunity." (Doc. 78, p 12.)

A.    Hill's Use of the Restraint Chair Was Not Objectively Unreasonable and Did Not Constitute Excessive Force.

"The Due Process Clause [of the Fourteenth Amendment] protects a pretrial detainee from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389 (2015). A pretrial detainee can only prevail if he provides objective evidence that the disputed governmental action was not rationally related to a legitimate governmental objective or that it was otherwise excessive in relation to that objective. Block v. Rutherford, 468 U.S. 576, 584 (1984). Further, a court "must

17

judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer" and "take account of the legitimate interests in managing a jail." <u>Kingsley</u>, 576 U.S. at 399. In determining the reasonableness of the force used, courts consider several factors, including, but not limited to:

> the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

<u>Id.</u> at 397. Importantly, when considering these factors, a court must "give a wide range of deference to prison officials acting to preserve discipline and security." <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007). Notably, restraints that are "reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced" had he not been in jail. <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979).

Although the court must view all the evidence in the light most favorable to the non-movant and draw all justifiable inferences from the evidence, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." <u>Ellis v. England</u>, 432 F.3d 1321, 1326 (11th Cir. 2005). "For factual issues to be considered genuine, they must have a real basis in the record." <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996). See, also, <u>Bingham v. HCA, Inc.</u>, 783 F. App'x 868, 875 (11th Cir. 2019). "[U]nsupported

speculation … does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)(quoting Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995)). Speculation about what the audio recording from a jail intake video might have said does not create a genuine issue of fact.

Below, the District Court's analysis on the Kingsley factors weighing in favor of a finding that Sheriff Hill's use of force was objectively unreasonable is flawed. First, the court relies on the intake video (Doc. 66) without sound to suggest there was no need for force whatsoever, even though Hill testified that Howell was verbally noncompliant and got louder once Hill showed up during the intake process. (Doc. 78, p. 7; Doc. 64-4, pp 13:4 – 14:4). Second, the court suggests that a six-hour period restrained in the chair is unreasonable, even though this Court has held longer periods of time in restraint chairs to be reasonable on numerous other occasions. See, e.g., Jacoby v. Beers, 779 F. App'x 676 (11th Cir. 2019) (eight hours); Williams v. Burton, 943 F.2d 943 F.2d 1572 (11th Cir. 1991)(twenty hours).  Third, the court relied on Howell's lacerations to his wrists to suggest the restraints were too tight, even though a nurse observed and checked the restraints for tightness throughout his time in the chair, as is CCJ policy, and Howell did not complain about the wrist restraints. (Doc. 78, p 7; Doc. 65-3; Doc. 63-1, p 47 (184:2-25).   Fourth, the court found that

Howell posed no threat during his confinement, only pre-confinement. (Doc. 78, pp 7-8). Hill explained that, based on Howell's pre-confinement destructive and violent behavior, he considered him a threat to jail security, and this was reinforced based on what Howell said to Hill from the restraint chair. (Doc. 64-4, p 14:7-23). The District Court then relied on this Circuit's precedent set forth in <u>Piazza v. Jefferson Cnty.</u>, that the "continued use of substantial force against a prisoner who has clearly stopped resisting – whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated – that use of force is excessive." 923 F.3d 947, 955 (11th Cir. 2019). (Doc. 78, p 8)(emphasis added). Unlike <u>Piazza</u>, which involved the use of a Taser multiple times, placing Howell in a restraint chair was not "substantial" force. In this citation, the District Court indicated that the <u>Piazza</u> court quoted <u>Danley v. Allen</u>, 540 F.3d 947 (11th Cir. 2019), involving use of pepper spray in a small, unventilated cell, and <u>Ort v. White</u>, 813 F.2d 318, 327 (11th Cir. 1987), where the Court held that denial of water to an inmate worker on a farm squad during times he refused to work did not constitute cruel and unusual punishment. None of these cases involved use of a restraining chair, or even other restraints.

Both Howell, in his brief, and the District Court failed to consider this Court's decision in <u>Crocker v. Beatty</u>, which is instructive here. 995 F.3d 1232 (11th Cir. 2021). There, the Court, applying the <u>Kingsley</u> factors, found that "there was very little 'force' used and essentially no harm done" even though the officers handcuffed the physically calm plaintiff, with no known history of violence, and left him in an un-

airconditioned car, still handcuffed, for up to 30 minutes in 84-degree weather. (Id. at 1238). The plaintiff "sweated profusely, experienced some trouble breathing, felt anxious" and reported to the officer that he was "about to die." (Id.). This Court ultimately held that this level of force and injury was de minimis, such that no violation of the Fourteenth Amendment could be found. (Id.); see also Gardner v. Mack, 12-0281-CG-C, 2015 WL 877249, at 56 (S.D. Ala. Mar. 2, 2015) ("Although plaintiff argues his calm behavior…should have…negated his ever being placed in the chair," the court granted summary judgment in favor of the defendant, finding the use of the restraint chair was constitutional.).

The evidence presented suggests Hill had valid objective reasons to believe that Appellee would become violent at the CCJ based on the totality of the circumstances pre-confinement. Hill ordered him into the chair out of concern that he was a threat to jail security, but he believed that Howell should probably have been restrained before Sheriff Hill even arrived. (Doc. 64-4, p 14:7 - 23). With thirty years' experience in law enforcement, Hill was arguably an expert in recognizing threats to his jail and preventing those threats from coming to fruition. Based on this expertise, in 2018, Hill implemented a specific restraint chair policy to provide "for the safety of [the inmate] so they can't harm themselves or others." (Doc. 65-6). The policy states that the chair may be used: (1) "[w]hen an inmate demonstrated violent or uncontrollable behavior," *or* (2) "[t]o *prevent* inmate self-injury, injury to others or property damage." (Doc. 65-6, p. 2 (emphasis added)). The policy explicitly states that the chair

21

can be used for prevention, not just as a reactionary measure. (Id.) Indeed, by using the passive restraint of the chair based upon an officer's awareness than an inmate was likely to become violent, the officers prevented violence rather than merely responding to it once it arose and, in so doing, avoided the use of more excessive force which would become necessary in restraining an actively violent inmate. (Id.)

In fact, Hill's placement of Howell in the chair without any other combined use of force followed the CCSO policy in preventing injury to Howell and the security staff at CCJ. Hill's good faith belief that the restraint chair was necessary in this scenario is substantiated by the undisputed fact that Howell was non-compliant, defiant, aggressive, used vile profanity and arguably racist remarks toward a known elected official, and he admitted to being under the influence of alcohol when he arrived at the CCJ. (Doc. 64-4, pp 6:10 – 9:22, pp 12:7 – 14:4:, pp 16:15 – 17:7; Doc. 63-1, pp 35 -40 (136:11 – 156:1), p 43 (168:6-19); Doc. 63-2; Doc. 63-3). Nonetheless, the District Court found that "Defendant employed substantial force against Plaintiff by having him tightly restrained to a chair for approximately six hours," but wholly fails to take into account the fact that Howell failed to prove that Hill caused his injuries. (Doc. 78, p. 12).

Howell admits that Hill left the intake area before he was wheeled to the suicide watch room in the medical infirmary, and he never saw Hill in the medical infirmary at any point while he was in the chair. (Doc. 64-1, p 48 (187:1-11); p 50 (195:13 – 15). Howell testified that his injuries were from the excessive force of the handcuffs on his

wrists and the duration spent in the chair, not the restraint of the chair itself. (Doc. 63-1, p 56 (218:7 – 12), p 58 (226:4 – 17). In fact, the Clayton County Sheriff's Office restraint chair policy required that handcuffs would be removed once a detainee was secured. (Doc. 65-6; Doc. 64-4, p 15:6-9). Howell presented no evidence proving that Hill controlled the duration of time he spent in the chair, nor did he present evidence showing that Hill demanded or forced his staff to keep the handcuffs on his wrists. To the contrary, Appellant testified that it was his expectation that his staff would follow the policy. (Doc. 64-4, pp 15:2 – 16:8).

If the handcuffs caused injury, then it was because staff ignored the policy and not because of any action Hill took. Hill expected them to remove the handcuffs once Appellee was placed in the chair. (Id.) If the six hours in the chair caused Howell injury, then that was also because the staff ignored the policy. Under these circumstances, Howell did not present facts that show a genuine issue of material fact undermining Hill's objective reasonableness in ordering passive restraint.

B.   Use of The Restraint Chair Did Not Violate Clearly Established Law under Any of the Three "Fair Warning" Methods

Physical restraint of varying degrees is often necessary to maintain order and security in correctional facilities. But when is use of a restraint chair a "use of force," and at what point can it become "excessive"? These questions deserve answers, but the answers do not yet exist. It is unclear in the Eleventh Circuit whether the use of restraint chairs even falls in that category of law enforcement conduct we call "the use

of force"—much less excessive force. This emphasizes that Hill could not possibly have been on notice that the use of a restraint chair as alleged here was unconstitutional and clearly established law. Thus, the District Court erred in finding that Plaintiff demonstrated a triable claim on a violation of clearly established law.

Due process requires an officer have "fair warning" that his conduct crosses a certain line. United States v. Lanier, 520 U.S. 259, 264-65 (1997). Such warning can only come from (1) "case law with indistinguishable facts" deriving from the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court; (2) "a broad statement of principle within the Constitution, statute, or case law;" or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Crocker, 995 F.3d at 1240. The Supreme Court repeatedly has warned that the second and third paths should not be used when it means defining "clearly established law at a high level of generality." Plumhoff v. Rickard, 572 U.S. 765, 779 (2014). The wrongfulness of the alleged conduct cannot simply be "suggested" by pre-existing precedent; rather, its "contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." City of Tahlequah, Oklahoma v. Bond, 595 U.S. 9, 12 (2021). The critical inquiry is, thus, "whether the law provided [Hill] with 'fair warning' that [his] conduct violated" the Fourteenth Amendment. McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007). The District Court missed the mark here.

1. <u>There is No Applicable Case Law with Indistinguishable Facts.</u>

Here, the law is not "clearly established" under the first "fair warning" option because there is no case law with even remotely similar facts which finds a constitutional violation. Indeed, the District Court determined that <u>Shuford v. Conway</u>, on which Howell relied, is "a materially similar case." (Doc. 78, p 9). As the District Court noted in its Order denying Howell's motion for summary judgment, however, <u>Shuford v. Conway</u> is an unpublished decision, and "the Court may only look to binding authority as 'materially similar precedent' in determining whether the law governing the circumstances was clearly established at the time of the alleged violation." (Doc. 78, p 10).

Hill disputes the characterization of <u>Shuford</u> as "materially similar." 666 F. App'x 811 (11th Cir. 2016). In <u>Shuford</u>, officers assigned to a specialized unit that resolves high-risk incidents entered into each of the four plaintiffs' cells without warning and "used techniques that resulted in audible responses of pain from [each of] the plaintiffs." <u>Id.</u> at 816. Although this Court considered the use of a restraint chair on unresisting detainees, it declined to classify that as force, focusing instead on the conduct preceding the use of the restraint chair: shooting a detainee with a Pepperball gun and slamming him to the floor; pinning a compliant detainee to the ground and handcuffing him; jumping on top of an compliant inmate and applying pressure point control techniques; and shooting an inmate with a Pepperball gun, stunning him with a Taser, and slamming his head into concrete, rendering him unconscious. Id. at 813-16. While the officers did not use pepperballs, tase or knock-

out two of the four plaintiffs, this Court noted that those plaintiffs had been arrested for nonviolent offenses and fully complied with the officers' commands to kneel and put their hands behind their backs. Id. at 814, 816. Moreover, the officers used brute force to get each of the plaintiffs in the chairs, as evidenced by audible cries of pain. Id. The Court's subtext here is that it is fine to place compliant detainees in restraint chairs, but officers cannot use brute force on non-resisting detainees to get them in the chairs. See id. Not only is the case non-binding, but also Howell's situation is simply too distinguishable from Shuford, or any other case for that matter, to be considered a clearly established fair warning.

Other cases in this Circuit involving unconstitutional violations and restraint chairs consistently focus on the other violence and not the chair itself as the unlawful use of force—which also supports the inference that this Court does not classify the chair as force. See e.g., Jacoby v. Keers, 779 F. App'x 676 (11th Cir. 2019) (pretrial detainee's allegations that he was pepper-sprayed and then defendants rubbed his face in pepper spray and placed in a restraint chair without first being decontaminated was contradicted by video evidence of the incident showing defendants thoroughly washed plaintiff's face and allowed him to remove his contaminated clothing before placing him in the restraint chair; defendants were entitled to qualified immunity with regard to placement in the restraint chair for eight hours); Coffman v. Battle, 786 F. App'x 926 (11th Cir. 2019) (officer placed inmate in a restraint chair before tasing him); Coffman v. Battle, No. 4:18-CV-22-HLM, 2019 WL 10303633, at *7 (N.D. Ga. Jan.

22, 2019) (describing the "force" as the tasing, not the restraint chair); McNeeley v. Wilson, 649 F. App'x 717, 720 (11th Cir. 2016) (inmate was placed in restraint chair after being pepper-sprayed and without decontamination, leading to significant skin damage); Maldonado v. Unnamed Defendant, 648 F. App'x 939, 945, 955 (11th Cir. 2016) (after inmate was in the restraint chair, officers broke his finger, kicked him, and burned him; the force happened after he was in the chair, implying that the force did not include the chair); Murphy v. Cobb County Adult Detention Center, No. 1:06-CV-3149-TCB, 2007 WL 1020798 (N.D. Ga. Mar. 30, 2007) (inmate was thrown to the floor, handcuffed, and punched repeatedly before sitting in a restraint chair for 10 hours); Perdue v. Union City, No. 1:05-CV-753-MHS, 2006 WL 2523094 (N.D. Ga. Aug. 28, 2006) (suicidal female detainee placed in a restraint chair nude for hours challenged the violation of her "right to bodily privacy," but did not claim the use of the chair constituted force). Like Shuford, none of the cases cited above is binding precedent and, therefore, cannot clearly establish the law.

Even if they were binding, this case presents a different story. Howell posed a threat to Hill and his deputies, was non-compliant and resistant in all of his relevant interactions with law enforcement, and he was under the influence of alcohol. At no point prior to arriving at the CCJ did Appellee comply with any orders. Not only was Appellee non-compliant, but also he showed disrespect and used vulgar profanity and hate speech towards an elected official. The aggressive nature of Howell's behavior, including destroying a deputy's yard and running his girlfriend off the road,

demonstrated that he was a potential threat at CCJ and it was objectively reasonable to restrain him for the safety of the jail population. It is undisputed that during Howell's intake at CCJ, no force was used prior to placing Howell in the restraint chair.

There is no controlling precedent particularized to the facts of this case that clearly establishes that Appellee's placement in a restraint chair on April 27, 2020, clearly constituted excessive force in violation of Appellee's constitutional rights under the Fourteenth Amendment. Nor would it have been obvious to every objectively reasonable government official that this conduct violated federal law. Indeed, the use of a restraint chair is common practice in jails and prisons, especially when dealing with individuals who are volatile and create unrest. Courts have even held that the mere use of four-point restraints or a restraint chair does not amount to a constitutional violation. See, e.g., Williams v. Burton, 943 F.2d 1572 (11th Cir. 1991) (affirming summary judgment to the defendants and finding that there was no constitutional violation because the four-point restraints were not used to inflict pain, but were ordered to prevent plaintiff from encouraging unrest in a volatile prison situation and to protect the prison officials); Taylor v. Nettles, Civil Action No. 1:11-1479-TLW-SVH, 2012 WL 4324444, at *2 (D.S.C. Sep. 20, 2012)(aff'd 509 F.App'x 201 (4th Cir. 2013)(granting summary judgment to prison officials where "[t]here was no resistance by the Plaintiff when placed in the restraint chair and prison officials used no force during the restraining procedure.").

More recently, this Court issued a published decision in <u>Myrick v. Fulton Cnty.</u>, 69 F.4th 1277 (11th Cir. 2023). In <u>Myrick</u>, declining to decide whether putting additional restraints on an inmate of a county jail while he was in a restraint chair is unconstitutional, this Court recognized that, as of 2023, the law was not clearly established and, therefore, the officers were entitled to qualified immunity. <u>Id.</u> at 1303-04. As discussed above, Hill testified that he was not aware that the officers left hand-cuffs on Howell while he was in the restraint chair. (Doc. 64-4, p 15:6-9). Even if he were, however, this Circuit has held that the law did not clearly establish a constitutional violation at the time of Howell's detention in 2020.

2.  <u>There Is No Broad Statement of Principle Within the Constitution, State, or Case Law that Applies with Obvious Clarity to These Facts.</u>

To defeat qualified immunity in lieu of no "case law with indistinguishable facts," the question then becomes whether either of the other two paths—a broad statement of constitutional law or conduct so clearly egregious that any officer would understand the wrongfulness of it—apply "beyond debate" to Hill's actions. See <u>Rivas-Villegas v. Cortesluna</u>, 595 U.S. 1, 5 (2021). The answer is no.

Astoundingly, the District Court attempted to evade <u>Shuford</u>'s unpublished status and ineligibility of material similarity to the instant case by ruling that the second path of fair warning applies here, completely disregarding the Supreme Court's warning that it should be "rarely-trod." See <u>Crocker</u>, 995 F.3d at 1240 ("Although we have recognized that options two and three can suffice, the Supreme Court has

warned us not to 'define clearly established law at a high level of generality.'" (citing Plumhoff v. Rickard, 572 U.S. 765, 779 (2014) (quotation marks omitted)). Both the District Court and Howell relied on the "broad statement" articulated in Piazza v. Jefferson County, where this Court held no matter what type of weapon is deployed, officers cannot use "substantial force" on detainees who are not resisting. 923 F.3d 947, 956 (11th Cir. 2019). The Piazza panel may have set out a "broad statement" of constitutional law that when substantial force is used against an unresisting detainee, the force is excessive. But that broad statement does not apply with "obvious clarity" to cases involving passive restraint. See Crocker, 995 F.3d at 1240.

It would seem obvious, at first blush, that placing someone in a chair is qualitatively different than repeatedly tasing a man who lies supine on the floor, but the District Court attempts to categorize passive restraint to fall within Piazza's "broad statement" when it pointed to dictum citing Williams v. Burton. But a close reading of Williams makes clear that it supports Hill's position, not Howell's. See Williams v. Burton, 943 F.2d 1572 (11th Cir. 1991). In Williams, officers taped an inmate's mouth closed and left him in a four-point restraint for 20 hours–approximately four times longer than the length of time Howell was restrained in this case. Williams, 943 F.2d at 1574, 1576. The Court did not address whether restraint could be used on a detainee who was not resisting because that question was not even presented in that case. The issue was whether the detainee was restrained longer than necessary "to meet the particular exigent circumstance" that justified the restraint. Id. The Court affirmed

qualified immunity because courts must "show great latitude to the discretion of prison officials in inmate management." Id. at 1577 (citing Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

This Court nonetheless held that the officers were owed deference in deciding how long was necessary to achieve their purpose. Williams, 943 F.2d at 1576; see also Reynolds v. Wood Co., Appeal No. 22-40381, 2023 WL 3175467, *4 (5th Cir. May 1, 2023) (affirming summary judgment where detainee was restrained for twelve hours and monitored and, "though temporarily uncomfortable, was not objectively severe enough to violate the Fourteenth Amendment," and noting that existing law, including Hope v. Pelzer, 536 U.S. 730 (2002), does not define at which point restraint becomes unconstitutional once a detainee is calm). It is unclear why the Piazza panel even referenced Williams, which does not at all support the proposition that restraint cannot be used on an unresisting detainee. And because the Williams panel sided with the officers, it is even more puzzling why the District Court believes that case to apply with obvious clarity to these facts.

Consider how often passive restraint is used to maintain order. Unresisting detainees are routinely placed in handcuffs and leg chains when they are moved through jail, and they often stay restrained for long periods of time even when calm. They can be chained to hospital beds when in infirmaries. They are restrained during transport or while in holding cells awaiting court. In fact, most detainees who appear in federal courts throughout this Circuit are handcuffed and often in leg shackles and

31

waist chains even while sitting calmly at counsel table during their own proceedings. But where is the line? If there are degrees of passive restraint, some acceptable and others not, there must nonetheless be notice of when that line is crossed.

Hill's conduct of authorizing a pretrial detainee, who was known to be violent and threatened the police force on numerous occasions, to be placed into a restraint chair after that detainee failed to turn himself in for multiple days after an arrest warrant was issued, and after consuming multiple alcoholic beverages immediately before showing up at the CCJ, is hardly so egregious that a constitutional violation clearly occurred. No case in this Circuit—not <u>Piazza</u>, and not <u>Williams</u>—applies "with obvious clarity" and "beyond debate" here, sufficient to provide Appellant with notice that his conduct violated Appellee's rights. See <u>Rivas-Villegas</u>, 595 U.S. at 7-8; <u>Crocker</u>, 995 F.3d at 1240.

## II.    The District Court Abused its Discretion in Denying Hill Summary Judgment When it Failed to Follow LR 56.1.

The District Court for the Northern District of Georgia's Local Rules set forth specific requirements for responding to a motion for summary judgment. LR 56.1(B)(3) states:

> "If respondent provides a statement of additional material facts, then, within the time allowed for filing a reply, the movant shall file a response to each of the respondent's facts. The range of acceptable responses is limited to: (a) an objection to the admissibility of the evidence upon which the respondent relies, (b) an objection pointing out that the respondent's evidence does not support the respondent's fact; (c) an objection on the ground that the respondent's fact is not material or does not otherwise comply with the provisions set out in LR

56.1(B)(1), and (d) a concession that the Court can properly consider the respondent's evidence for purposes of the summary judgment motion."

In Howell's reply to plaintiff's statement of material facts (Doc. 65-1), Howell attempted to dispute only eighteen of the seventy-one paragraphs of fact set forth by Hill in his statement of material facts (Doc. 64-2). However, plaintiff fails to properly dispute these facts. In his reply, Howell failed to offer proper objections to paragraphs 13, 14, 17, 18, 19, 20, 21, 25, 41, 42, 46, 54, 55, 56, 57, 58, 60, and 61. (Doc. 65-1, ¶¶ 13, 14, 17, 18, 19, 20, 21, 25, 41, 42, 46, 54, 55, 56, 57, 58, 60, 61.) Moreover, his citations to the evidence did not actually refute the facts set forth in these paragraphs and he failed to support many of his responses with citations to the evidence, altogether.

Under the District Court's rules, a movant's fact will be deemed admitted unless the respondent "directly refutes the movant's fact with concise responses supported by specific citations to evidence" or asserts a valid objection to the movant's factual assertion. LR 56.1(B)(2)(a)(2). See also Reese v. Herbert, 527 F.3d 1253, 1267 (11th Cir. 2008) (The pertinent requirement of Local Rule 56.1 is that the respondent to a summary judgment motion must file a response to the movant's statement of undisputed facts which sets forth, as to each numbered undisputed fact that the respondent is contesting, "specific citations to evidence (including page or paragraph number)" that support the respondent's version of the facts. In the absence of such

specific citations to evidence, the court "will deem each of the movant's facts as admitted." LR 56.1(B)(2)(a)(2), NDGa.).

A failure to comply with LR 56.1 "is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1303 (11th Cir. 2009) (affirming the exclusion of "convoluted, argumentative and non-responsive" answers). Where the material facts are undisputed, reasonableness is a pure question of law for the court to resolve. <u>O'Neal v. DeKalb Cnty.</u>, 850 F.2d 653, 657, n.6 (11th Cir. 1988). Based on Howell's failure to properly object to Hill's statement of undisputed material facts, the District Court should have deemed Hill's statement of undisputed material facts as admitted, and the Court abused its discretion is denying Hill summary judgment.

<u>CONCLUSION</u>

As demonstrated above, the District Court erred in denying Appellant Hill's motion for summary judgment on the ground that Appellee Howell has demonstrated a triable claim of excessive force sufficient to defeat qualified immunity. First, the District Court incorrectly concluded that a reasonable jury could conclude that the amount of force used by Hill – directing his jail officers to put Howell in a restraint chair – was excessive in violation of the Fourteenth Amendment's due process clause. On the contrary, the record shows that, per CCJ policy, the restraint chair may be used to prevent inmate self-injury, injury to others, or property damage. It is undisputed that Howell's pre-detention behavior was destructive, violent and

disrespectful, and Sheriff Hill reasonably determined that he posed a threat to the security of the jail. Additionally, it is undisputed that Howell was not subjected to any use of force prior to his placement in the chair. And it is undisputed that Howell failed to demonstrate that any action by Hill caused his injuries. Second, the District Court erred in finding that the conduct of placing Howell in a restraint chair, which is but de minimis force if it is a use of force at all, was so egregious that Hill would have fair warning that he violated a constitutional right, even in the absence of case law. If Howell has failed to meet his burden to establish both of these prongs, Hill is entitled to qualified immunity. For these reasons, this Court should reverse the District Court's Order denying summary judgment.

Respectfully submitted,

/ s/  Sean Keenan
Sean Keenan

Attorney for Appellant Victor Hill

<u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 9,341 words. In addition, this brief complies with the style and size requirements of FRAP 32(a)(5) and (6).

This 19th day of April, 2024.

CRUSER, MITCHELL, NOVITZ, SANCHEZ, GASTON & ZIMET, LLP

<u>/ s/  Sean Keenan</u>
Sean Keenan

Meridian II, Suite 2000
275 Scientific Drive
Norcross, Georgia 30092
(404) 881-2623
skeenan@cmlawfirm.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this day electronically filed this BRIEF OF APPELLANT-DEFENDANT CLAYTON COUNTY SHERIFF VICTOR HILL using the Electronic Case Files ("ECF") system, which automatically will serve Appellee and other counsel of record by email to:

Darryl L. Scott
Georgia Bar No. 635479
Law Office of Darryl L. Scott, LLC
33 Jonesboro Street
McDonough, GA 30253
770-474-5646
<u>darryl@dscottlawoffice.com</u>

This 19th day of April, 2024.

/ s/  Sean Keenan
Sean Keenan
Georgia Bar No. 523871
<u>skeenan@cmlawfirm.com</u>
Direct: (678) 684-2154

CRUSER, MITCHELL, NOVITZ,
SANCHEZ, GASTON & ZIMET, LLP
Meridian II, Suite 2000
275 Scientific Drive
Norcross, Georgia 30092